**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. **16-20471**CR-ALTONAGA

18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(1)(A)          /O'SULLIVAN
18 U.S.C. § 2
18 U.S.C. § 982

UNITED STATES OF AMERICA

vs.

JOSE AVILA and
MICHAEL BAHRAMI,

                **Defendants.**
_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this Indictment,

### The Medicare Program

1.      The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled.  The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.  Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) and a Federal health care program, as defined by Title 42, United States Code, Section 1320a-7b(f).

3.      Medicare programs covering different types of benefits were separated into different program "parts." "Part A" of the Medicare program covered certain eligible home health care costs for medical services provided by a home health agency ("HHA"), also referred to as a "provider," to persons who already qualified for Medicare and who additionally required home health services because of an illness or disability that caused them to be homebound.

4.      CMS did not directly pay Medicare Part A claims submitted by Medicare-certified HHAs. CMS contracted with different private companies to administer the Medicare Part A program throughout different parts of the United States. In the State of Florida, CMS contracted with Palmetto Government Benefits Administrators ("Palmetto"). As administrator, Palmetto was to receive, adjudicate and pay claims submitted by HHA providers under the Part A program for home health claims. Additionally, CMS separately contracted with companies in order to review HHA providers' claims data. CMS first contracted with TriCenturion, a Program Safeguard Contractor. Subsequently, on December 15, 2008, CMS contracted with SafeGuard Services, a Zone Program Integrity Contractor. Both TriCenturion and SafeGuard Services safeguarded the Medicare Trust Fund by reviewing HHA providers' claims for potential fraud, waste, and/or abuse.

5.      Physicians, clinics and other health care providers, including HHAs, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was

required to set forth, among other things, the beneficiary's name and Medicare information number, the services that were performed for the beneficiary, the date that the services were provided, the cost of the services, and the name and provider number of the physician or other health care provider who ordered the services.

### Part A Coverage and Regulations

#### Reimbursements

6.     The Medicare Part A program reimbursed 100% of the allowable charges for participating HHAs providing home health care services only if the patient qualified for home health benefits.  A patient qualified for home health benefits only if the patient:

(a)     was confined to the home, also referred to as homebound;

(b)     was under the care of a physician who specifically determined there was a need for home health care and established the Plan of Care ("P.O.C."); and

(c)     the determining physician signed a certification statement specifying that the beneficiary needed intermittent skilled nursing, physical therapy, speech therapy, or a continued need for occupational therapy; the beneficiary was confined to the home; that a POC for furnishing services was established and periodically reviewed; and that the services were furnished while the beneficiary was under the care of the physician who established the P.O.C.

#### Record Keeping Requirements

7.     Medicare Part A regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting the actual treatment of patients to whom services were provided and for whom claims for reimbursement were submitted by the HHA. These medical records were required to be sufficiently complete to permit Medicare,

3

through Palmetto and other contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program.

8.      Among the written records required to document the appropriateness of home health care claims submitted under Part A of Medicare were a: (i) P.O.C. that included the physician order, diagnoses, types of services/frequency of visits, prognosis/rehab potential, functional limitations/activities permitted, medications/treatments/nutritional requirements, safety measures/discharge plans, goals, and the physician's signature; and (ii) a signed certification statement by an attending physician certifying that the patient was confined to his or her home and was in need of the planned home health services.

9.      Medicare Part A regulations required provider HHAs to maintain medical records of every visit made by a nurse, therapist, and home health aide to a beneficiary. The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any instruction provided to the patient and the understanding of the patient, and any changes in the patient's physical or emotional condition. The home health nurse, therapist, and aide were required to document the hands-on personal care provided to the beneficiary as the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury. These written medical records were generally created and maintained in the form of "clinical notes" and "home health aide notes/observations."

10.     Medicare regulations allowed Medicare certified HHAs to subcontract home health care services to nursing companies, therapy staffing services agencies, registries, or groups (nursing groups), which would bill the certified home health agency. The Medicare certified HHA would, in turn, bill Medicare for all services rendered to the patient. The HHA's

professional supervision over subcontracted-for services required the same quality controls and supervision as of its own salaried employees.

## The Defendants, Related Entities, and Co-Conspirators

11.   Willsand Home Health Agency, Inc. ("Willsand") was incorporated on or about July 10, 2000, and did business in Miami-Dade County, Florida, purportedly providing home health care and physical therapy services to eligible Medicare beneficiaries.

12.   JEM Home Health Care, LLC ("JEM") was a limited liability Florida corporation incorporated on or about May 29, 2003, and did business in Miami-Dade County, Florida, purportedly providing home health care and physical therapy services to eligible Medicare beneficiaries.

13.   Healthy Choice Home Health Services Inc. ("Healthy Choice") was incorporated on or about October 4, 2007, and did business in Miami-Dade County, Florida, purportedly providing home health care and physical therapy services to eligible Medicare beneficiaries.

14.   **JOSE AVILA**, a resident of ~~Miami-Dade~~ *Broward* County, was a medical doctor.

15.   **MICHAEL BAHRAMI**, a resident of Miami-Dade County, was a medical doctor.

16.   Co-Conspirator Khaled Elbeblawy, a resident of Broward County, was an office manager at Willsand, an owner of JEM, and an owner/manager of Healthy Choice.

17.   Co-conspirator Eulises Escalona, a resident of Monroe County, was an owner of Willsand and JEM.

18.   Co-conspirator Cynthia Vilches, a resident of Broward County, was an owner of Healthy Choice.

## COUNT 1
### Conspiracy to Defraud the United States and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

1.      Paragraphs 1 through 18 of the General Allegations section of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around May of 2006, and continuing through in or around March of 2012, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

### JOSE AVILA and
### MICHAEL BAHRAMI,

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with Khaled Elbeblawy, Eulises Escalona, Cynthia Vilches, each other, and with others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a.      to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare program, in violation of Title 18, United States Code, Section 371; and to commit an offense against the United States, that is:

b.      to knowingly and willfully solicit and receive remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A).

6

## PURPOSE OF THE CONSPIRACY

3.      It was a purpose of the conspiracy for **JOSE AVILA**, **MICHAEL BAHRAMI** and their co-conspirators to unlawfully enrich themselves by, among other things:  (1) soliciting and receiving kickbacks and bribes in return for referring Medicare beneficiaries to various HHAs to serve as patients; (2) submitting and causing the submission of claims to Medicare for home health services that the HHAs purportedly provided to those beneficiaries; and (3) to use the Medicare payments to pay the kickbacks and further the conspiracy.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things:

4.      **JOSE AVILA** and **MICHAEL BAHRAMI** received kickbacks from co-conspirators at Willsand, JEM, and Healthy Choice in exchange for referring Medicare beneficiaries to serve as patients at Willsand, JEM and Healthy Choice.

5.      **JOSE AVILA**, **MICHAEL BAHRAMI**, and their co-conspirators caused Willsand, JEM and Healthy Choice to submit claims to Medicare for home health services purportedly provided to the recruited beneficiaries.

6.      As a result of these claims, **JOSE AVILA** and **MICHAEL BAHRAMI** caused Medicare to make payments to Willsand, JEM, and Healthy Choice for home health services purportedly provided to Medicare beneficiaries, which payments were then used to continue the conspiracy.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one of the co-conspirators committed and caused to be committed in the Southern District of Florida

at least one of the following overt acts, among others.

1.     On or about March 3, 2010, **JOSE AVILA** referred patient L.C. to Healthy Choice.

2.     On or about March 4, 2010, **JOSE AVILA** referred patient I.G. to Healthy Choice.

3.     On or about March 10, 2010, **JOSE AVILA** referred patient S.D. to Healthy Choice.

4.     On or about March 10, 2010, **MICHAEL BAHRAMI** referred patient N.L. to Healthy Choice.

5.     On or about June 1, 2010, Cynthia Vilches caused Healthy Choice to submit a claim to Medicare in the approximate amount of $6,700 for patient N.L., listing **MICHAEL BAHRAMI** as the referring physician.

6.     On or about March 6, 2011, **MICHAEL BAHRAMI** referred patient A.R. to Healthy Choice.

7.     On or about April 16, 2011, **MICHAEL BAHRAMI** referred patient P.R. to Healthy Choice.

8.     On or about May 14, 2011, **MICHAEL BAHRAMI** referred patient F.P. to Healthy Choice.

9.     On or about June 24, 2011, **MICHAEL BAHRAMI** referred patient S.G. to Healthy Choice.

10.    On or about June 24, 2011, **JOSE AVILA** referred patient L.C. to Healthy Choice.

11.    On or about June 27, 2011, **MICHAEL BAHRAMI** continued to allow his name

8

to be used as the referring physician resulting in **MICHAEL BAHRAMI** and Cynthia Vilches causing Healthy Choice to submit a claim to Medicare in the approximate amount of $2,800 for patient A.R.

12.    On or about July 1, 2011, **MICHAEL BAHRAMI** continued to allow his name to be used as the referring physician resulting in **MICHAEL BAHRAMI** and Cynthia Vilches causing Healthy Choice to submit a claim to Medicare in the approximate amount of $2,500 for patient P.R.

13.    On or about July 1, 2011, **MICHAEL BAHRAMI** continued to allow his name to be used as the referring physician resulting in **MICHAEL BAHRAMI** and Cynthia Vilches causing Healthy Choice to submit a claim to Medicare in the approximate amount of $1,200 for patient F.P.

14.    On or about August 5, 2011, **MICHAEL BAHRAMI** continued to allow his name to be used as the referring physician resulting in **MICHAEL BAHRAMI** and Cynthia Vilches causing Healthy Choice to submit a claim to Medicare in the approximate amount of $2,300 for patient S.G.

15.    On or about August 25, 2011, **JOSE AVILA** continued to allow his name to be used as the referring physician resulting in **JOSE AVILA** and Cynthia Vilches causing Healthy Choice to submit a claim to Medicare in the approximate amount of $2,000 for patient L.C.

16.    On or about August 26, 2011, Khaled Elbeblawy withdrew approximately $7,500 in cash from an account he held at Chase Bank.

17.    On or about October 5, 2011, Cynthia Vilches negotiated a check, numbered 1799, in the approximate amount of $7,500, written from Healthy Choice's bank account to Cynthia Vilches.

18.     On or about October 6, 2011, Cynthia Vilches withdrew approximately $3,500 in cash from an account she and Khaled Elbeblawy held at Chase Bank.

19.     On or about October 6, 2011, Khaled Elbeblawy withdrew approximately $3,500 in cash from an account he and Cynthia Vilches held at Chase Bank.

20.     On or about October 21, 2011, **JOSE AVILA** referred patient I.G. to Healthy Choice.

21.     On or about November 16, 2011, **JOSE AVILA** referred patient S.D. to Healthy Choice.

22.     On or about December 31, 2011, **JOSE AVILA** continued to allow his name to be used as the referring physician resulting in **JOSE AVILA** and Cynthia Vilches causing Healthy Choice to submit a claim to Medicare in the approximate amount of $1,800 for patient I.G.

23.     On or about March 23, 2012, **JOSE AVILA** continued to allow his name to be used as the referring physician resulting in **JOSE AVILA** and Cynthia Vilches causing Healthy Choice to submit a claim to Medicare in the approximate amount of $2,700 for patient S.D.

All in violation of Title 18, United States Code, Section 371.

### COUNT 2
**Receipt of Kickbacks in Connection with a Federal Health Care Program**
**(42 U.S.C. § 1320a-7b(b)(1)(A))**

1.     Paragraphs 1 through 14 of the General Allegations section of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.     On or about January 6, 2014, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**JOSE AVILA,**

did knowingly and willfully solicit and receive remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a federal health care program, that is, Medicare, as set forth below:

| Count | Approximate Date of Payment | Approximate Amount |
|-------|------------------------------|--------------------|
| 2 | January 6, 2014 | $1,600 |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A) and Title 18, United States Code, Section 2.

### FORFEITURE
### (18 U.S.C. § 982)

1.     The allegations contained in this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendants, **JOSE AVILA** and **MICHAEL BAHRAMI** have an interest.

2.     Upon conviction of a violation of Title 18, United States Code, Section 371, as alleged in this Indictment, the defendants, **JOSE AVILA** and **MICHAEL BAHRAMI**, shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense pursuant to Title 18, United States Code, Section 982(a)(7).

3.     The property which is subject to forfeiture includes, but is not limited to, the sum of approximately $430,000, as to **JOSE AVILA** and approximately $515,000 as to **MICHAEL BAHRAMI**, which sums represent the gross proceeds of the offenses alleged in the Indictment.

4.      If any of the property described above, as a result of any act or omission of the defendant:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred or sold to, or deposited with, a third party;

        c.      has been placed beyond the jurisdiction of the court;

        d.      has been substantially diminished in value; or

        e.      has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

All pursuant to Title 18, United States Code, Section 982(a)(7), and the procedures set forth in Title 21, United States Code, Section 853, made applicable by Title 18, United States Code Section 982(b)(1).

A TRUE BILL

_____
FOREPERSON

WIFREDO A. FERRER
UNITED STATES ATTORNEY

GEJAA GOBENA, DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

VASANTH R. SRIDHARAN
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| UNITED STATES OF AMERICA | CASE NO. _____ |
|---|---|

vs.

**Jose Avila and Michael Bahrami,**
                        **Defendants.**
_____/

# CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

**Court Division:** (Select One)

| | New Defendant(s) | Yes _____ | No ___X___ |
|---|---|---|---|
| __X__ Miami    _____ Key West | Number of New Defendants | | |
| _____ FTL    _____ WPB    _____ FTP | Total number of counts | | |

I do hereby certify that:

1.   I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.   I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.   Interpreter:       (Yes or No)        __Yes__
     List language and/or dialect        __Spanish__

4.   This case will take __10__ days for the parties to try.

5.   Please check appropriate category and type of offense listed below:

(Check only one)                                                      (Check only one)

| I | 0 to 5 days | _____ | Petty | _____ |
|---|---|---|---|---|
| II | 6 to 10 days | ___X___ | Minor | _____ |
| II | 11 to 20 days | _____ | Misdem. | _____ |
| IV | 21 to 60 days | _____ | Felony | ___X___ |
| V: | 61 days and over | _____ | | |

6.   Has this case been previously filed in this District Court?    (Yes or No)        __NO__
If yes:
Judge:                                            Case No. _____
(Attach copy of dispositive order)
Has a complaint been filed in this matter?        (Yes or No)        __YES__
If yes:
Magistrate Case No.                              16-mj-2806-McAliley
Related Miscellaneous numbers:                   _____
Defendant(s) in federal custody as of            06/09/2016
Defendant(s) in state custody as of              _____
Rule 20 from the _____          District of _____

Is this a potential death penalty case? (Yes or No)        __No__

7.   Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?        _____ Yes      __X__ No

8.   Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?        _____ Yes      __X__ No

VASANTH SRIDHARAN
DOJ Trial Attorney
Court ID No. A5501204

*Penalty Sheet(s) attached

REV 4/8/08

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**  **JOSE AVILA**

**Case No**:

Count #: 1

Conspiracy to Defraud the United States and Receive Health Care Kickbacks

Title 18, United States Code, Section 371

**\* Max. Penalty**:        Five (5) years' imprisonment

Count #: 2

Receipt of Kickbacks in Connection with a Federal Health Care Program

Title 42, United States Code, Section 1320a-7b(b)(1)(A)

**\*Max. Penalty:**        Five (5) years's imprisonment

Count #:

**\*Max. Penalty:**

Counts #:

**\*Max. Penalty:**

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

<u>PENALTY SHEET</u>

**Defendant's Name**: **MICHAEL BAHRAMI** _____

**Case No**: _____

Count #: 1

<u>Conspiracy to Defraud the United States and Receive Health Care Kickbacks</u>

<u>Title 18, United States Code, Section 371</u>

**\* Max. Penalty**:      Five (5) years' imprisonment

Count #:

_____

_____

**\*Max. Penalty:**

Count #:

_____

_____

**\*Max. Penalty:**

Counts #:

_____

_____

**\*Max. Penalty:**

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**